UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTINA GAVIN,

                              Plaintiff,

              -v-

CITY OF NEW YORK, *et al.*,

                              Defendants.

20-CV-8163 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

On October 1, 2020, Plaintiff Christina Gavin filed this police misconduct case against

Sergeant Matthew Tocco and Inspector Gerard Dowling of the New York City Police

Department ("NYPD") and the City of New York ("the City").  (Dkt. No. 1.)  Gavin brings state

and federal excessive force, false arrest, and fair trial claims against Defendants, in relation to

her November 22, 2019 arrest and the subsequent initiation of criminal proceedings against her.

Gavin also brings a *Monell* claim against the City, based on the City's alleged failure to train

NYPD officers on appropriate methods for dispersing protesters.

On February 17, 2021, Defendants filed a motion to dismiss Gavin's fair trial and *Monell*

claims.  (Dkt. No. 24.)  For the reasons that follow, the motion is granted in part and denied in

part.

I.       **Background**

The following facts are drawn from the First Amended Complaint and are assumed true

for purposes of this motion.

On November 22, 2019, Gavin attended a protest in Harlem, going down West 125th

Street.  (Dkt. No. 22 ¶ 10.)  Shortly after the protest began, NYPD officers "corralled protesters"

and forced them into the street.  (Dkt. No. 22 ¶ 11.)  Using a loudspeaker, the officers informed

the protesters that their gathering was unlawful and ordered them to disperse.  (Dkt. No. 22 ¶ 12.)
Gavin "immediately" attempted to comply.  (Dkt. No. 22 ¶ 13.)

Notwithstanding her desire to leave, Gavin had difficulty navigating her way out of the
street: A bus blocked her access to the sidewalk on one side of the street, and on the other side,
traffic was "bumper to bumper."  (Dkt. No. 22 ¶¶ 14–15.)  Gavin continued walking along West
125th Street, trying to find a safe path to the sidewalk.  (Dkt. No. 22 ¶ 16.)  In doing so, Gavin
passed a police van.  (*Id*.)

As Gavin passed the police van, she was confronted by Defendants Tocco and Dowling,
who grabbed both of her arms.  (Dkt. No. 22 ¶¶ 17–18.)  Defendant Tocco asked Gavin where
she thought she was going, and when Gavin tried to respond, Defendant Dowling yelled, "[s]hut
the fuck up!"  (Dkt. No. 22 ¶ 18.)  Defendants Tocco and Dowling then kicked Gavin's legs,
causing her to fall to the asphalt.  (Dkt. No. 22 ¶ 19.)  Once Gavin was on the ground,
Defendants Tocco and Dowling placed her in handcuffs.  (Dkt. No. 22 ¶ 20.)

A different NYPD officer, Jonathan Calderon, was assigned to process Gavin's arrest.
(Dkt. No. 22 ¶¶ 24–26.)  Over the several hours that Officer Calderon brought Gavin to, and
accompanied her in, One Police Plaza and New York County Central Booking, Officer Calderon
spoke with Gavin about the events of the protest.  (Dkt. No. 22 ¶ 27.)  Gavin recalls Calderon
stating that he "didn't see what happened" with Defendants Tocco and Dowling but that when he
saw Gavin, she was "calm."  (*Id*.)  Officer Calderon speculated that he may not have placed
Gavin in handcuffs and that she could "just sue" the NYPD if she felt that she had been
improperly arrested.  (*Id*.)

Defendants Tocco and Dowling recounted the events of November 22, 2019, differently.
They swore out a criminal complaint against Gavin in which they affirmed that she had jumped

on Defendant Dowling's back while he and Defendant Tocco were arresting another protester. (Dkt. No. 22 ¶ 29.)  Gavin was arraigned on that complaint.  (Dkt. No. 22 ¶ 28.)  At her arraignment, Gavin negotiated and accepted an adjournment in contemplation of dismissal, through which she avoided the prosecution on the charges against her.  (Dkt. No. 22 ¶ 32.)  The charges were later dismissed.  (*Id.*)

Following the dismissal of the charges, Gavin filed this case on October 1, 2020.  (Dkt. No. 1.)  Defendants moved to dismiss several of the claims in the original complaint, and Gavin responded by filing an amended complaint.[1]  (Dkt. No. 17; Dkt. No. 22.)  Defendants now move to dismiss the same claims that they challenged in their initial motion, as repleaded in the amended complaint.  (Dkt. No. 24.)

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In considering the motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002).  And while "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, the Court must draw "all inferences in the light most favorable to the nonmoving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

---

[1] Plaintiff's amended complaint mooted Defendants' January 2021 motion to dismiss.  The motion is denied accordingly.

III.    **Discussion**

Defendants seek the dismissal of Gavin's fair trial and *Monell* claims.  They argue (1)
that the fair trial claim fails because Gavin did not obtain a "favorable termination" of the
criminal proceedings against her and (2) that the *Monell* claim fails because Gavin has
insufficiently pleaded that the City exhibited deliberate indifference with respect to the rights of
protesters.  These arguments are addressed in turn.

A.      **Fair Trial Claim**

Gavin brings a fair trial claim based on Defendants Tocco and Dowling's supposed
fabrication of evidence.  Defendants argue that Gavin's adjournment in contemplation of
dismissal ("ACD") precludes this claim, reasoning that the ACD did not terminate the criminal
charges in Gavin's favor.  Consistent with the majority of cases in this Circuit, *see Nigro v. City
of New York*, No. 19-cv-2369, 2020 WL 7629455, at *3 (S.D.N.Y. Dec. 22, 2020), the Court
agrees.

In the wake of the Supreme Court's recent *McDonough v. Smith* decision, a plaintiff
bringing a fabricated evidence claim needs to plead not only the traditional elements of the claim
but also that the challenged criminal proceedings terminated in her favor.  139 S. Ct. 2149, 2156
(2019) ("McDonough could not bring his fabricated-evidence claim under § 1983 prior to
favorable termination of his prosecution."); *Ashley v. City of New York*, 992 F.3d 128, 140 (2d
Cir. 2021); *see also Kayo v. Mertz*, _ F. Supp. 3d _ , 2021 WL 1226869, at *17 (S.D.N.Y. Mar.
31, 2021).  This additional requirement "is rooted in pragmatic concerns with avoiding parallel
criminal and civil litigation over the same subject matter and the related possibility of conflicting
civil and criminal judgments."  *McDonough*, 139 S. Ct. at 2157.  It is designed to prevent
"collateral attacks on criminal judgments through civil litigation."  *Id*.

The question presented by Gavin's case is whether an ACD constitutes a favorable termination.  The Court concludes that it does not.  Shy of acquittal, criminal proceedings can terminate favorably for the accused when the government declines to proceed with the prosecution and "the failure to proceed implies a lack of reasonable grounds for the prosecution." *Russo v. State of New York*, 672 F.2d 1014, 1019 (2d Cir. 1982) (internal quotation marks and citation omitted).  An ACD is the "bargained-for dismissal of [a] criminal case" and does not permit such an inference of innocence.  *Rothstein v. Carriere*, 373 F.3d 275, 287 (2d Cir. 2004); *see* N.Y. Crim. Proc. Law § 170.55.  In exchange for an ACD, the accused may offer good behavior, community service hours, or even an affidavit incriminating other persons.  *See, e.g., Delgado v. City of New York*, No. 19-cv-6320, 2021 WL 2473817, at *14 (S.D.N.Y. June 17, 2021); *Daniels v. Taylor*, 443 F. Supp. 3d 471, 479 (S.D.N.Y. 2020); *Rothstein*, 373 F.3d at 288. In other words, the accused grants the government some convenience, so as to prevent the government from trying to prove her guilt.  *Rothstein*, 373 F.3d at 287.  In *Rothstein v. Carriere*, a malicious prosecution case, the Second Circuit assessed that the accused "bought peace" through an ACD and could "not thereafter assert that the proceedings [] terminated in his favor." *Id*. at 287 (emphasis omitted).  The accused was not permitted to assail the proceedings that he himself brought to a premature close.  In light of *McDonough*, the same logic applies in the context of Gavin's fair trial claim.  Gavin may not "target[] the very evidence" that undergirds her ACD and "that would have [] been shielded from collateral attack," had the government been able to proceed to and prevail at trial.  *Miller v. Terrillion*, 436 F. Supp. 3d 598, 606 (E.D.N.Y. 2020).

Gavin highlights that the court in *Ross v. City of New York*, No. 17-cv-3505, 2019 WL 4805147 (E.D.N.Y. Sept. 30, 2019), rejected the analogy between fabricated evidence claims

arising in the fair trial context and those arising in the malicious prosecution context.  For

substantially the same reasons as most other courts in the Second Circuit, the Court declines to

follow *Ross*.  *See, e.g., Daniels*, 443 F. Supp. 3d at 479; *Delgado*, 2021 WL 2473817, at *15;

*Corso v. Calle Palomeque*, No. 17-cv-6096, 2020 WL 2731969, at *8 n.14 (S.D.N.Y. May 26,

2020).  *Ross* relies on pre-*McDonough* jurisprudence that was "based, in part, on the principle

that favorable termination is not an element of a fair trial claim," and assumes that the fair trial

cause of action's Sixth Amendment roots distinguishes it from the malicious prosecution cause

of action, which invokes the Fourth Amendment and due process clauses.  2019 WL 4805147, at

*7–8 & n.14.  The outdated line of cases is unpersuasive, as is the distinction between the

constitutional bases for fair trial and malicious prosecution claims.  Adopting *Ross*, the court in

*Simon v. City of New York* explained the constitutional argument as follows:  The government's

use of fabricated evidence necessarily deprives an accused of a fair trial under the Sixth

Amendment but does not, absent an indication of the accused's innocence, render a prosecution

unreasonable under the Fourth Amendment.  No. 16-cv-1017, 2020 WL 1323114, at *5–6

(E.D.N.Y. Mar. 19, 2020).  From this, *Simon* determined that the termination of criminal

proceedings may be viewed more leniently in the fair trial context than in the malicious

prosecution context.  But *Simon*'s analysis does not withstand scrutiny.  First, an ACD is not a

favorable termination in the malicious prosecution context even if the alleged fabricated

evidence is the only evidence that the government used to supply probable cause.  Second and

relatedly, *Simon*'s analysis is inapposite to *McDonough*'s concerns of finality and consistency

that animate the favorable termination requirement.  Gavin's argument that her ACD is a

favorable termination is unavailing, and her fair trial claim is dismissed accordingly.

### B.   *Monell* Claim

Gavin brings a § 1983 municipal liability claim against the City under *Monell v.*
*Department of Social Services*, based on the City's supposed failure to train NYPD officers on
giving protesters an opportunity to disperse following a dispersal order.[2]  436 U.S. 658, 691
(1978).  Although "the inadequacy of police training may serve as a basis for § 1983 liability,"
such liability arises "only where the failure to train amounts to deliberate indifference to the
rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489
U.S. 378, 388 (1989).  Defendants contest whether Gavin has plausibly pleaded the City's
deliberate indifference to the rights of protesters.

The Second Circuit has established three requirements for showing deliberate
indifference: (1) "the plaintiff must show that a policymaker knows to a moral certainty that her
employees will confront a given situation"; (2) "the plaintiff must show that the situation either
presents the employee with a difficult choice of the sort that training or supervision will make
less difficult or that there is a history of employees mishandling the situation"; and (3) "the
plaintiff must show that the wrong choice by the city employee will frequently cause the
deprivation of a citizen's constitutional rights."  *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d
Cir. 2007).  The parties do not meaningfully contest the first and third of these requirements.  *See*

---

[2] In opposing the motion to dismiss, Gavin construes her *Monell* claim as about the NYPD's
failure to train officers on not kettling protesters, not giving false testimony, and permitting
protesters a means of egress following a dispersal order.  (Dkt. No. 33 at 9.)  Although the
amended complaint cursorily lists Gavin's grievances with the City's supposed kettling and
perjury practices, it offers no allegations — beyond Gavin's own experience — relating to them.
(Dkt. No. 22 ¶¶ 66, 68.)  In contrast, the amended complaint contains an entire section entitled
"***NYPD's Policies and Practices Relating to Dispersal Orders and Opportunity to Comply***."
(Dkt. No. 22 ¶¶ 36–49 (emphasis in original).)  To the extent that Gavin attempts to assert a
*Monell* claim with respect to kettling and perjury, the claim is insufficiently pleaded.  As
discussed *infra*, Gavin's *Monell* claim with respect to dispersal orders is adequately pleaded.

*Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at *22 (S.D.N.Y. Mar. 7, 2016).

It is undeniable that NYPD officers will encounter and attempt to disperse protests. *See City of Canton*, 489 U.S. at 390 n.10 (limiting moral-certainty analysis to whether police will encounter the specific policing circumstance at issue, not a police department's likelihood of violating rights in that circumstance); *accord Felix v. City of New York*, 344 F. Supp. 3d 644, 660 (S.D.N.Y. 2018).  It is similarly apparent that rights violations will occur if NYPD officers order protesters to disperse, provide protesters with no opportunity to disperse, and then begin enforcing the dispersal order. *Marom*, 2016 WL 916424, at *22 ("It is plausible to infer from the [complaint], and is a matter of general common sense, that . . . NYPD officers mishandling large protests could cause constitutional deprivations").  The crux of the motion to dismiss is whether Gavin has plausibly pleaded the second requirement, that NYPD officers have a history of mishandling protest dispersal.[3]  *See id*.

"[T]he pre-discovery pleading standard for a [*Monell*] custom or practice is not a high bar," and just a handful of instances of "similar" unconstitutional misconduct, in addition to a plaintiff's own experience, can warrant proceeding to discovery. *DiPippo v. Cnty. of Putnam*, No. 17-cv-7948, 2019 WL 1004152, at *9 (S.D.N.Y. Feb. 28, 2019).  In her amended complaint,

---

[3] Gavin does not contend that dispersing protests necessarily presents NYPD officers with a difficult choice.  This is a wise decision.  An inherently difficult choice may be presented when NYPD officers are equipped with new technologies or are called upon to engage individuals with serious mental illness. *See, e.g., Edrei v. City of New York*, 254 F. Supp. 3d 565, 581 (S.D.N.Y. 2017) (difficult choice presented by the NYPD's non-military use of long range acoustic devices, a military tool for ships to project noise to ward off other ships); *Felix*, 334 F. Supp. 3d at 660 ("[G]iven the extreme volatility of such individuals . . . it is plausible that interactions with emotionally disturbed persons presents officers with difficult choices of the sort that training will make less difficult" (citation omitted)).  Absent a history of misconduct, there is no reason to believe that training is necessary for NYPD officers to reach the common-sense conclusion that they must give protesters an opportunity to comply with their orders before they start making arrests.

Gavin lists three cases in which she says the City was sued for "failure to provide meaningful opportunities to comply with dispersal orders." (Dkt. No. 22 ¶ 39.) This is an accurate characterization of the cases. In *Peat et al. v. City of New York et al.*, a case about a 2011 Occupy Wall Street protest, the plaintiffs alleged that the NYPD gave a dispersal order but "did not permit [protesters] to leave or otherwise disperse and arrested approximately 700 of the marchers." Amended Complaint, Dkt. No. 9 ¶ 205, 12-cv-8230 (Nov. 13, 2012). In *Case et al. v. City of New York et al.*, another Occupy Wall Street case, the plaintiffs alleged that the NYPD failed to give "adequate dispersal orders, thereby subjecting [protesters] to mass arrest processing, prosecution, and [] injuries." Second Amended Complaint, Dkt. No. 41 ¶ 100, 14-cv-9148 (Nov. 17, 2014). Likewise, *Dinler et al. v. City of New York et al.*, a case about the 2004 Republican National Convention protests, challenged the NYPD's failure to provide an adequate dispersal order with which protesters were permitted to comply. Third Amended Complaint, Dkt. No. 132 ¶ 20, 04-cv-7921 (Dec. 10, 2007). The parties in *Peat* settled, but *Case* and *Dinler* proceeded to summary judgment. The court in *Case* denied the City's motion for summary judgment on the plaintiffs' *Monell* claim, citing the "lack of evidence that the NYPD trains officers in . . . [the] length of time for providing meaningful opportunity for compliance" with a dispersal order. 408 F. Supp. 3d 313, 329 (S.D.N.Y. 2019). And the court in *Dinler* granted the plaintiffs' motion for summary judgment on their false arrest claim, based in part on video evidence showing that "protesters were not given any [] opportunity to comply [with a dispersal order] and continue the march, were blocked by a line of officers on bicycles, and were ultimately arrested." 2012 WL 4513352, at *8 (S.D.N.Y. Sept. 30, 2012). These cases, in which the plaintiffs alleged that NYPD officers prevented them from complying with dispersal orders, present circumstances similar and pertinent to the misconduct alleged here. *See Felix*, 334 F.

Supp. 3d at 662 ("Even if the precise factual circumstances of these cases vary, . . . Plaintiffs'

allegation that the cases illustrate NYPD officers' repeated failures [of the same kind] is at least a

plausible one.").

Contrary to Defendants' position, *Peat*, *Case*, *Dinler*, and Gavin's own experience are

not "isolated incidents" of police misconduct.  (Dkt. No. 26 at 14 & n.13.)  Gavin has done more

than identify, say, "two incidents of unconstitutional conduct by low-level employees in a city

agency with over 35,000 employees."  *Davis v. City of New York*, 228 F. Supp. 2d 327, 346

(S.D.N.Y. 2002) (finding no pattern or practice in the context of a motion to set aside the

verdict); *but see Ferrari v. Cnty of Suffolk*, 790 F. Supp. 2d 34, 46 (E.D.N.Y. 2011) (holding

that, on a motion to dismiss, "[t]hree instances (including Plaintiff's own claim) . . . permit a

plausible inference of a widespread practice or informal custom").  Instead, she has pleaded

"repeated complaints of civil rights violations," brought by hundreds of plaintiffs across *Peat*,

*Case*, *Dinler*, and *Dinler*'s related cases.[4]  *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.

1995).  The numerosity of the plaintiffs across these cases, and of the non-party victims

described in their complaints, *see Osterhoudt v. City of New York*, No. 10-cv-3173, 2012 WL

4481927, at *2 (E.D.N.Y. Sept. 27, 2012) ("While plaintiff's citations to pending lawsuits and

settlement agreements will not suffice to overcome summary judgment they do permit a

plausible inference of deliberate indifference [at the motion to dismiss stage]." (internal

quotation marks and citation omitted)), permits the inference of a pervasive problem with

NYPD's training, not a "single instance of faulty training."  *Fowler v. City of New York*, No. 13-

cv-2372, 2019 WL 1368994, at *12 (E.D.N.Y. Mar. 26, 2019).

---

[4] There were 14 plaintiffs in *Peat*, four in *Case*, and three in *Dinler*.  *Dinler* was the lead case for
76 member cases, all bringing claims of similar police misconduct in relation to the 2004
Republican National Convention protests.

Additionally, Gavin has plausibly alleged the absence of any "meaningful attempt on the part of the municipality to . . . forestall further incidents" relating to improper dispersal orders. *Vann*, 72 F.3d at 1049. Beyond the three cases and her own experience, Gavin references two depositions and a report prepared by the City's Law Department to show that the NYPD has yet to rectify its allegedly insufficient training regarding dispersal orders. (Dkt. No. 22 ¶¶ 44, 46, 48.) According to the amended complaint, the depositions reveal that the NYPD has not changed any of its training or operations in response to the protest-related litigation undertaken between 2000 and 2011, *i.e.*, in response to *Peat*, *Case*, and *Dinler*. *See also In re New York City Policing During Summer 2020 Demonstrations*, No. 20-cv-8924, 2021 WL 2894764, at *10 (S.D.N.Y. July 9, 2021) (explaining that the NYPD, in policing protests in 2020, allegedly exhibited "the same behaviors that were alleged against the same police force in connection with the demonstrations in 2003, during the 2004 Republican National Convention, and during the 2011 Occupy Wall Street protests"). The Law Department Report reaches a similar conclusion: "[T]he NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests." JAMES E. JOHNSON, CORPORATION COUNSEL REPORT PURSUANT TO EXECUTIVE ORDER 58 (JUNE 20, 2020) DIRECTING AN ANALYSIS OF FACTORS IMPACTING THE GEORGE FLOYD PROTESTS IN NEW YORK CITY 2 (Dec. 2020), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf; *see also Felix*, 344 F. Supp. 3d at 661 (relying on a report published after the disputed incident because "the City was on notice of training deficiencies when they began research"). Indeed, the Law Department Report directly addresses dispersal orders, reminding the NYPD that it must give protesters "enough time to exit the area" and provide protesters with "sufficient avenues of egress to be able to exit the area." *Id*. at 49. Altogether, Gavin has pleaded an uninterrupted history of

NYPD officers mishandling dispersal orders at protests and has thus pleaded deliberate indifference for the purposes of her *Monell* claim.

Having determined that the *Monell* claim survives Defendants' challenge, the Court addresses Defendants' request that the case be bifurcated for the purposes of discovery, such that Gavin's excessive force and false arrest claims are handled before the *Monell* claim.  The Court grants this request.  It has long been the position of courts in the Second Circuit that

> since the City's liability is derivative of the individual defendants'
> liability, and since the proof required to establish a *Monell* claim is
> substantially different from the proof necessary to establish
> individual liability, the most prudent course is to [address] the
> *Monell* claims separately and to stay discovery concerning those
> claims until the liability of the individual defendants is established.

*Morales v. Irizarry*, No. 95-cv-5068, 1996 WL 609416, at *1 (S.D.N.Y. Oct. 22, 1996) (collecting cases); *Brown v. City of New York*, No. , 2016 WL 616396, at *2 (S.D.N.Y. Feb. 16, 2016) ("Courts in this Circuit favor bifurcating *Monell* claims." (citation omitted)); *accord Amato v. City of Saratoga Springs, N.Y.*, 170 F.3d 311, 316 (2d Cir. 1999) ("[B]ifurcation may be appropriate where . . . the litigation of the first issue might eliminate the need to litigate the second issue . . . [B]ecause a trial against the City defendants would prove unnecessary if the jury found no liability against [the police officers], bifurcation would further the goal of efficiency.").  The convenience and efficiency concerns control in this case.  The core of the parties' dispute is whether Gavin was peacefully searching for a means of egress when she was arrested or whether she jumped on Defendant Dowling's back while he and Defendant Tocco were arresting another protester.  The Court does not envision that resolving this dispute will, as Gavin warns, lead to "endless disputes about Defendants' training and background" and the discoverability of training materials.  (Dkt. No. 33 at 21.)  Bifurcating the case, at least until

Gavin prevails on a motion for summary judgment, bears the potential of reducing unnecessary discovery and is therefore warranted.  This decision is without prejudice to whether any trial in this case should be bifurcated.  *See Tabor v. New York City*, No. 11-cv-195, 2012 WL 603561, at *11 (E.D.N.Y. Feb. 23, 2012).

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Discovery will be stayed with respect to Gavin's *Monell* claim, but will go forward on her excessive force and false arrest claims.

Defendants shall file their answers to the remaining claims within 21 days after the date of this Opinion and Order.

The Clerk of Court is directed to close the motions at Docket Numbers 17 and 24.

SO ORDERED.

Dated:  August 24, 2021
        New York, New York

J. PAUL OETKEN
United States District Judge